## TAYLOR impleaded with WILSON, *appellant*, and PERKINS, *respondent*.

Where advances are made and responsibilities assumed by one individual to aid another in establishing and carrying on a particular business without benefit or advantage to accrue to the party making the advances, although there be an agreement that he shall have the *control and disposition of the property* acquired by the means thus furnished, the property is subject to a *creditor's bill*, unless previous to the filing thereof *actual possession* be taken  The relation between the parties is that of *debtor and creditor;* it is not that of *mortgagor and mortgagee*—nor are the parties *partners*.

APPEAL from Chancery.  Perkins having, in 1834, issued an execution on a judgment obtained by him against Wilson for $1,412, which was returned *nulla bona*, filed a *creditor's bill* against Wilson in December, 1837, making *Taylor* and other persons parties thereto, charging them with having in their possession property belonging to Wilson.  *Taylor* put in an answer stating that Wilson being insolvent and unable to carry on business upon his own credit, applied to him in 1835 to furnish him with the means of carrying on the business of slaughtering cattle and packing beef; and that an arrangement was made between them, that he, (Taylor,) should furnish to Wilson the means with which to purchase cattle; and to reimburse him for all advances he might make and to indemnify him against all responsibilities he might incur on account of the business, he *should have and hold the exclusive control and disposition of all the beef* which should be packed by Wilson, and all other property and effects which should be purchased by Wilson with moneys furnished by him (Taylor,) or obtained by Wilson upon his (Taylor's) responsibility.  That it was agreed that he (Taylor,) should advance $10,000 for carrying on the business, and that for such further funds as might be wanted, drafts should be made upon commission merchants in New-York upon beef to be consigned to them for sale.  Taylor accordingly accepted the drafts

of Wilson to the amount of $10,000, and became responsible to two houses in New-York for any advances they might make to Wilson beyond property consigned to them. Under this arrangement, Wilson commenced operations at Albany, and did business to the amount of $300,-000. On the filing of the bill by Perkins an *injunction* was issued, and at the time of the service of the injunction there were on hand at the slaughtering house in Albany, two hundred and eighty-seven barrels of beef and eighty-nine barrels of hams, worth $4,694, which were subsequently transmitted to the commission merchants in New-York, and for the value of which *Wilson* drew; but his drafts not being accepted on account of the injunction, *Taylor*, in April, 1838, drew for the amount in his own name, and his drafts were accepted and paid. Taylor admitted in his answer, that the whole business was carried on by Wilson in his own name, and that the barrels in which the beef was packed and shipped were marked with the name of Wilson; but he *denied that Wilson was entitled to or had any interest in the proceeds of the beef, except that in case of a surplus after paying all charges and expenses, and reimbursing him and discharging all his liabilities, Wilson would have been entitled to the residue of the moneys arising from the sale of the beef, if any there should be.* Taylor and Wilson stated, in a joint answer put in by them, that up to the time of the filing of the bill in this cause *no profits* had been made in the business, over and above the amount necessarily drawn from the business by Wilson for the support of himself and family; and that after applying the proceeds of the business to the advances made and responsibilities assumed by Taylor, there was a balance of $3,000 due to him. They further stated that the beef on hand at Albany at the time of the filing of the bill in this cause, was stored in the slaughtering house of Wilson, *subject to the control of Taylor* under the arrangement of 1835; but it was not alleged that *Taylor* took actual possession of it, or that it was forwarded by him to

New-York. Proofs were taken in the cause substantially verifying the statement of facts contained in the answers.

The cause was heard on the pleadings and proofs by the Assistant Vice-Chancellor of the first circuit, who, after adverting to the facts of the case, delivered the following opinion:

"It appears to me only necessary to present the facts with accuracy to lead to a decision. Every act of ownership that such property was susceptible of, was exercised by Wilson, and not one by Taylor. The purchase, the preparation, the storing in his own premises, the marking with his own name, the transmission, and the act of drawing upon the proceeds, designate Wilson as the true owner. The very fact of passing his drafts to Taylor is rather an indication that the latter relied upon these for repayment, than a proof of any ownership in or claim upon the property itself. At any rate, there is no view in which the case can be presented stronger than as an equitable lien created, and valid between the parties; but under our statute as to the necessity of a change of possession wholly void as to creditors. If a written express mortgage would have been inoperative, as is very clear, this secret and parol lien most clearly must be so.

Taylor must be decreed to pay the amount of the complainant's judgment, interest and costs."

A decree was entered accordingly, from which Taylor, appealed to the CHANCELLOR, who _affirmed_ the decree of the Vice-Chancellor, and delivered the following opinion:

"I think the Assistant Vice-Chancellor arrived at the correct conclusion, that the _general property_ of the beef in question was in the defendant, Wilson; and that Taylor was _a mere mortgagee_ thereof, out of possession, to secure advances. If so, his mortgage, in case it is to be considered as valid in other respects, so as to make it valid and binding as between Wilson and Taylor, was absolutely void as against the creditors of Wilson, the property _never having been delivered_ to, or been in the actual possession

of Taylor, the mortgagee; and the mortgage, under which he claims a lien upon property, for the security of his advances, not having been filed in the clerk's office, as directed by the act of May, 1833. From the very nature of the business it was impossible that the property should have been the exclusive proceeds of the capital furnished by the appellant, so as to give it an ear mark: as the personal services of Wilson himself, in purchasing and slaughtering the cattle, and packing the beef, &c., constituted a part of the value of the beef in its manufactured state; and the appellant never attempted to exercise any act of ownership over the beef, until the consignees, after the filing of this bill, refused to accept Wilson's draft. It is evident, therefore, that the parties to that agreement understood that Taylor was merely to have a lien upon the property in the nature of a mortgage, for security of the advances; and as there could be no legal lien without possession, except by a mortgage, duly filed, it follows of course that the creditor by the filing of his bill, obtained the legal right to have his judgment satisfied out of this property, which, at the time of filing the complainant's bill, was in the possession of, and under the control of Wilson, the judgment debtor. The decision of the Supreme Court, in *Russell* v. *Butterfield*, 21 *Wend.* 300, as to a mortgage given for the purchase money, is not applicable to this case, as the legal title to this property was never in Taylor, the mortgagee. There, also, the mortgage was filed in the clerk's office, though it was not done immediately.

Again: it would be destructive to the interests of commerce to establish the principle, that a contract with the borrower of money, for the purpose of carrying on his ordinary business, should give the lender a lien upon all property purchased with the capital thus furnished, or the proceeds of it, in preference to the bona fide creditors and purchasers from the borrower; and I am not prepared to say such an agreement would amount to a valid mortgage, even if filed in the clerk's office. I am inclined to the opi-

**1841.**

Taylor
*v.*
Perkins.

nion, that to make a mortgage valid, under the statute, the property intended to be held thereby, must be so described that it can be identified, without relying upon the declarations of the parties thereto, exclusively, to identify it, by reference to the particular funds with which it was, or may afterwards be purchased.

For these reasons, the decree appealed from is affirmed, with costs; and the respondent is to recover interest on the amount decreed by the Assistant Vice-Chancellor, as damages for the delay caused by this appeal."

Taylor appealed from the decision of the Chancellor to this court, where the case was argued by:

*J. Harris* and *M. T. Reynolds,* for the appellant.

*J. W. Gerard,* for the respondent.

*Points submitted and argued on the part of the appellant:*

I. The appellant was the legal owner of the property specified in the pleadings and proofs. Because, 1st. It was purchased for him by his agent, and with his funds. 2nd. The claim of Wilson did not relate to the legal title to the property, but to a portion of the proceeds of the sale. 3rd. The answers distinctly set out this fact, and the proof instead of controverting, establishes it.

II. If the legal title to the property was not in the appellant, he had an equitable claim, which being at least equal to the respondents, a court of equity will not give its aid to defeat.

III. The statute relating to the sale or mortgage of chattels has no application to this case: 1. This was not a purchase by the appellant *from Wilson.* 2. Nor was it a mortgage from Wilson to appellant. 3. Certainly not a mortgage which *could be recorded.* 4. The statute can only be applied to *written mortgages,* and other interests are left as they were before the statute. They were not abolished by the statute.

IV. The contract between the appellant and Wilson was honest in fact, and not in violation of law or public policy.

*Points submitted and argued on the part of the respondent :*

I. The *property* in the beef, &c., killed and packed by Wilson, at his establishment, was in him, (Wilson.) The defendant, Taylor, only loaned his credit to Wilson, and was a mere creditor, if ever he had to pay out on his acceptances faster than he was put in funds by Wilson's drafts on his agents in New-York, without having a specific *lien or mortgage* on the beef for his running acceptances so lent.

II. If as between *Wilson* and *Taylor* the latter was intended to have a *specific lien* or *mortgage* on the beef, &c., yet *possession* being in *Wilson*, and *he* the *purchaser, seller* and *ostensible owner*, and entitled to all the profits, the beef was liable to execution by his judgment creditors. Such would be the case even if there was an *express mortgage in writing, it not being recorded or accompanied by possession;* the *reason* of the statute applies with more force against *implied* liens, than even to express ones.

III. But if the arrangements made by Taylor and Wilson in 1835, *if carried out*, would have given Taylor an equitable mortgage, it was *never acted upon*, BUT WAS WAIVED by the clearest and strongest acts of *waiver*, both on the part of *Taylor* and Wilson.

After advisement, the following opinions were delivered:

*Mr. Justice* BRONSON said, that according to his view of the case, the relation of mortgagor and mortgagee did not exist between *Wilson* and *Taylor*, and that, therefore, in his judgment, the law governing mortgages had no application; nor was there any fraud in the transaction. The only question is, who was the owner of the property, *Wilson* or *Taylor ?* If he could protect the ap-

pellant from loss upon any known principle of law, it would gratify him; but he had not been able to discover any principle, which would bear him out in doing so. The relation between the parties was that of debtor and creditor, and nothing more. The appellant himself, in his answer, does not claim to be the owner of the property, and the agreement that he should have the control and disposition of the beef, and of all other property and effects purchased by Wilson with funds furnished by him, or obtained on his responsibility, amounted to nothing until he availed himself of the stipulation by taking actual possession of the property. It had been said, that the appellant and Wilson were partners, but there was no foundation for that position; there was no community of profits, and it is not to be presumed that Taylor himself ever thought of forming a partnership with an insolvent. All that can be said is, that Wilson was under an honorary obligation to protect Taylor from loss; but Taylor, not having obtained the control of the property, and the creditor having secured his lien, the decree of the Chancellor, in his judgment, ought to be affirmed.

*By Senator* Verplanck. The view that I have taken of this transaction is this: It was not a *partnership*, as was maintained, for there is no stipulated communion of profits between the parties; nor were they to participate on any partnership principle in loss, since Taylor was first to be indemnified for all his advances. It has none of the features of an agency. Wilson purchasing and carrying on the business, in his own name, and on his own account, for his own profit, aided merely by the credit advanced to him by Taylor. It is plainly a regular advance of credit by Taylor to Wilson, to be secured by Taylor's having (as appears in proof) " the exclusive control and disposition of all the beef and property purchased by Wilson, or obtained on his responsibility." It was a contract that the beef, &c. thus purchased by means of Taylor's credit,

1841.

Taylor
v.
Perkins

should be liable to be held in pledge or mortgage to secure advances; but it was not an actual pledge or mortgage on specific property.   It was a valid contract between Taylor and Wilson, by which the former was entitled thus to secure himself for any of his liabilities.   He might have taken possession of the beef, &c. when fit for market and shipped it in his own name to his agent; in which case there would have been a valid and specific pledge.   He might have made such arrangements by filing of mortgages from time to time, according to the statute, with such precautions of publicity as to the mode of carrying on the business, as would probably have protected him without actual possession.   He did neither.   The agreement between these parties, then, was a contract, valid in itself, and binding upon them, but not so carried into effect by the exercise of the stipulated " control and disposition," as to make it effectual against creditors or subsequent purchasers.

The decree should be affirmed.

On the question being put, *Shall this decree be reversed?* all the members of the court present, who had heard the argument, answered in the negative.   Whereupon the decree of the Chancellor was AFFIRMED.